THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* BENJAMIN SHERMAN, MORRIS STEIN, LEO SILVER, BARNEY SCHLESSINGER, LOUIS LAPP and BEATRICE RICHER, Defendants.

Court of General Sessions of County of New York, June 29, 1951.

*Murray I. Gurfein* for Benjamin Sherman, defendant.

*Bernard Fliashnick* for Morris Stein, defendant.

*Frank S. Hogan, District Attorney (Chester E. Kleinberg* and *Oscar A. Bloustein* of counsel), for plaintiff.

VALENTE, J. The defendants herein have been jointly indicted and charged with conspiracy, embracing a violation of section 962 of the Penal Law — which prohibits " kick-back " of wages — and the crime of forgery in the third degree, and with forty-nine specific violations of the " kick-back " and forgery statutes.

Sanitary Automatic Candy Corporation is engaged in the business of selling candy and refreshment. It has concessions in theatres located in this city. In some of these theatres, sales are made not alone from stands in the lobby, but are solicited in the theatre proper. The men in charge of these concessions are known as " chargemen ".

These " chargemen " and their salesmen or hawkers are the subjects of a collective bargaining agreement between the Sanitary Automatic Candy Corporation and the Amusement Clerks & Concessionaires Employees Union, Local 1115-C, R. C. I. A., A. F of L., which provides that the corporation pay the " chargemen " 20% of the gross sales in the theatres, less the wages of any hawkers, with a minimum guarantee of $60 per week. The salesmen are hired by the " chargemen " but paid by the corporation.

The indictment sets forth that the " chargemen " were supervised by the defendants Leo Silver, Barney Schlessinger and Louis Lapp, who, in turn, were under the control and supervision

of the defendants Benjamin Sherman and Morris Stein, managers of the corporation's business relating to concession houses.

The conspiracy count alleges that the defendants Sherman and Stein provided for the compensation of these supervisors by compelling and obliging the " chargemen " to " kick-back " 2½% of the 20% of gross sales they received under the union agreement.

The defendants Sherman and Stein move for a dismissal of the indictment as to them, on the court's inspection of the minutes with the customary alternative order therein granting an inspection of the Grand Jury minutes. They urge in support of their motion that section 962 of the Penal Law was not intended to apply to the " chargemen " because they are not workmen within the meaning of the section and that the 2½% received by the supervisors was payment received from the " chargemen " for services rendered.

To warrant an indictment, the quantum of the evidence before the grand jury must be such as in their judgment, if unexplained or uncontradicted, would warrant a conviction by a trial jury. (Code Crim. Pro., § 258.)

A reading of the Grand Jury minutes compels the conclusion that the defendants were parties to an agreement to force the " chargemen " to accept less compensation than they were to receive under the union contract with Sanitary. If the " chargemen " come within the protection of section 962 of the Penal Law, then this agreement was unlawful and the defendants were parties to a conspiracy to violate said section.

Having arrived at that conclusion, it becomes necessary to consider the contention of the defendants that the " chargemen " are not workmen within the meaning of section 962 of the Penal Law.

This presents a question, the answer to which vitally affects not only the individual defendants but untold thousands of wage earners since an application of the standard contended for by the defendants would mean that the vast majority of wage earners would be deprived of the protection of this section.

Section 962, as originally enacted in 1934 (L. 1934, ch. 171), read as follows: " 2. Whenever an agreement for the performance of personal services requires that workmen engaged in its performance shall be paid the prevailing rate of wages, it shall be unlawful for any person * * * to request, demand * * * that such workman pay back, return, donate, contribute or give any part or all of said workman's wages, salary ".

In 1939 (L. 1939, ch. 851), the section was amended to its present form and now provides:

" 2. Whenever any workman who is engaged to perform labor shall be promised an agreed rate of wages for his service, * * * it shall be unlawful for any person * * * to request, demand * * * donation or contribution of any part or all of said workman's wages, salary, or other thing of value, upon the statement, representation or understanding that failure to comply with such request or demand will prevent such workman from procuring or retaining employment. * * *

" 3. Whenever an agreement between a bona fide labor organization and an employer * * * requires that workmen shall be paid an agreed wage or rate of wages for their services, it shall be unlawful for any person, either for himself or any other person, to request, demand * * *, either before or after such workman is engaged, that such workman pay back, return, donate, contribute or give any part or all of said workman's wages, salary, or thing of value, to any person, upon the statement, representation or understanding that failure to comply with such request or demand will prevent such workman from procuring or retaining employment, and any person who directly or indirectly aids, requests or authorizes any other person to violate any of the provisions of this section shall be guilty of a violation of the provisions of this section."

The original enactment was inspired by the plight of workmen in the building and allied trades who were compelled to agree to a lesser wage as a condition to obtaining and retaining employment despite the fact that a prevailing rate of wage existed and was recognized.

The change sought to be effected by the 1939 amendment can best be summarized by quoting from Governor Lehman's message approving the amendment:

" This bill remedies the shortcomings of the existing ' kickback ' law.

" At present the law protects only workingmen covered by prevailing wage agreements. Thus a large group of workers engaged in private employment remains unprotected and subject to all the vicious practices of rebates on wages. Under this bill these workingmen receive this much-needed protection." (Public Papers of Governor Herbert H. Lehman, June 13, 1939, p. 369.)

The amendment, by eliminating all reference to prevailing rate of wage demonstrates beyond cavil the legislative intent

to include in the protection of the statute *all* workmen engaged to perform labor for an agreed rate of wage, and specifically to protect those workmen (without qualification) for whose benefit unions have entered into contracts with employers.

The general concept of the word " workman " is one who works for another. It includes the restricted category of manual laborer, or one employed on particular work, an operator or a skilled worker.

The Court of Appeals, in *Matter of Bowne* v. *Bowne Co.* (221 N. Y. 28, 31–32), recognizes and adopts this general meaning of the word where it defines " workman " broadly as " one who works in any department of physical or mental labor, but, in common speech, is one who is employed in manual labor, such as an artificer, mechanic or artisan ".

In *Matter of Europe* v. *Addison Amusements* (231 N. Y. 105) the Court of Appeals, adopting the definition laid down in *Matter of Bowne* v. *Bowne Co.* (*supra*), by widening the meaning of the words " manual labor " held that the term " workman " included a stage manager, a man who handled baggage and his assistant, as well as a valet.

Again, using the broader definition, the Appellate Division, Third Department, in *Matter of Jurman* v. *Hebrew National Sausage Factory* (198 App. Div. 456), held that a cook, a waiter, a counterman and a " helper " or general utility man who helped the waiter, cook and counterman, were workmen.

The usage of the word " workman " and the definitions supplied by the courts refute the limited application of the word urged by the moving parties.

In *People* v. *Brill* (255 App. Div. 452) the Appellate Division, First Department, in construing section 962 of the Penal Law, even before the broadening 1939 amendment, in no way limited the protection offered by the statute by holding on page 456: " Our construction of the statute does not by any means render it futile nor do we limit it to a contract between an individual mechanic and his employer. On the contrary, it will apply, as we think it was particularly intended to apply, where there is a contract between the employer and the union concerning the rate of wages to be paid to ' workmen engaged in its performance.' The history of this legislation does not suggest that the statute is intended to apply to construction contracts presumed to have made the contract in the interest of workmen, but rather to *instances in which the union has entered into a* between contractor and subcontractor, neither of whom can be

*contract with the employer for the benefit of its members, which the employer ought not to be permitted to circumvent by receiving back in secret a portion of the wages paid."* (Underscoring mine.)

Concurring in a separate opinion, CALLAHAN, J., and COHN, J., express themselves as follows (p. 458): " I construe section 962 of the Penal Law to relate to *any agreement,* the performance of which imposes or carries as a necessary accompaniment thereto the rendition of personal services by workmen ". (Underscoring mine.)

The statute under consideration, while penal in nature, is also remedial. Hence, it is not given the strict construction generally accorded penal laws, but instead is to be equitably and liberally construed. It must be interpreted so as to promote justice, suppress the mischief and advance the remedy.

In so doing, the language of the statute is generally construed according to its natural and most obvious sense, and words of ordinary import receive their understood meaning. (McKinney's Cons. Laws of N. Y., Book 1, Statutes [1942 ed.], §§ 94, 95, 275, 321; Penal Law, § 21.)

Where a word is susceptible of a broad or limited meaning, it should be given the meaning that legitimate sources of interpretation countenance and one that is not repugnant to the clear intention of the Legislature.

To carry out effectively the clear purpose which the Legislature had in enacting this statute, its application should not be restricted to the narrow and limited groups comprising only manual, mechanical or industrial workers.

The key word of this section is the word " kick-back ". This is so because the manifest intent of the Legislature was to protect all wage earners from the " kick-back racket " rather than to define or limit the particular classes to be protected.

The language of the statute is sufficiently explicit, particularly when considered in the light of the evil sought to be remedied, and the historical background, to permit of a construction that would not vitiate the apparent intent of the Legislature.

Accordingly, at this stage of the proceedings, I cannot, in good conscience, accept the contention that the section does not include within its protection the " chargemen " involved in this case. Certainly such an application of the amended statute should be made, *if at all,* only after a disclosure of all the evidence upon the trial bearing upon the status of these " chargemen " insofar as the application of section 962 of the Penal Law is concerned.

This court cannot grant vicarious immunity to the defendants by adopting a narrow construction of the language employed by the Legislature. To do so, would be to deprive the worker of the protection afforded by the statute.

Having ruled that the defendants are not entitled to the limited definition of the word " workman " so as to exclude " chargemen " from the coverage of section 962, it seems idle to labor the word " wages " or " rate of wage ". If, upon the trial, it is ruled as a matter of law or found as a fact, after all the evidence is adduced, that " chargemen " do not come within the coverage of the law, it makes no difference whether or not a " wage " or a " rate of wage " was agreed upon. If the contrary be established, the application of the law and the benefits and rights of workmen should not rest on a narrow interpretation of the word " wages ".

There is no merit to the contention that, since the compensation of the " chargemen " is determined on the basis of a percentage of their gross sales that this does not constitute an agreed wage or rate of wage as provided by the statute, because it is conceded that they were to receive a minimum of $60 per week. This guarantee by agreement is a sufficient answer to the contention that " chargemen " are not within the provisions of the statute because they employ salesmen to sell the merchandise and the " chargemen's " remuneration is calculated upon such sales. The determining factor is not the source of the " chargemen's " pay but the agreement to pay as provided in the union contract.

For the reasons indicated, the application is denied.